UNITED STATES BANKRUPTCY COURT
EASTERN DISTRICT OF LOUISIANA

IN RE:                                                      CASE NO.

**THUNDERVISION, L.L.C.**                                   **09-11145**
                                                            SECTION A
DEBTOR                                                      CHAPTER 7


**DAVID V. ADLER, TRUSTEE**                                 ADVERSARY NO.

PLAINTIFF                                                   **12-1058**

VERSUS

**ROGER WAYNE SMITH, ET AL**

DEFENDANTS

## <u>MEMORANDUM OPINION</u>

On September 25 and 26, 2013, trial in the above-captioned adversary proceeding came before the Court.  Post-trial briefs were filed on October 4, 2013, at which time the Court took the matter under advisement.

## I.  Findings of Fact

Thundervision, L.L.C.'s ("Thundervision") primary business was the publication of *Louisiana Homes and Gardens* ("*LH&G*") magazine.  It  maintained the website ourhouse.biz, which published content from and offered subscriptions to *LH&G*.  Roger Wayne Smith ("Smith") and Dale C. Higgins ("Higgins") are the managing members and equal owners of Thundervision.

Smith received, as the primary salesperson at *LH&G*, an annual salary of $78,000.  Higgins was Thundervision's Chief Financial Officer  and was paid $36,000 annually but  was not involved in the daily operation of *LH&G*.  At various times, Thundervision also employed between  two (2) and eight (8) other employees, including Smith's significant other, Melanie Wallace ("Wallace").

Thundervision operated out of Smith's residence.  Smith also operated another business out of the same residence, Streetcarshops.com, L.L.C. ("Streetcar").   Streetcar used some of the same contractors and advertisers as Thundervision.  It also  advertised in *LH&G*.  When Thundervision ceased operations, Streetcar owed Thundervision $9,000.[1]  Higgins had no interest or involvement in Streetcar.

On April 21, 2009, Thundervision filed a petition for relief under chapter 11 of the U. S. Bankruptcy Code and employed Stewart Peck, Christopher Caplinger, and the firm of Lugenbuhl, Wheaton, Peck, Rankin & Hubbard as its attorneys.[2]   Higgins prepared and signed all Monthly Operating Reports filed by Thundervision.

On April 5, 2010, the Court approved Thundervision's Amended Disclosure Statement ("Disclosure Statement"), signed by both Smith and Higgins as members.[3]   The Disclosure Statement lists among Thundervision's assets: office equipment, computers, the trademark and name of  *LH&G*, subscription lists, and advertiser lists.[4]  Thundervision scheduled accounts receivable of $60,568.[5]  By confirmation, accounts receivable totaled $111,850.

---

[1] *See* Higgins, Exh. 9.

[2] Bankruptcy case no. 09-11145.

[3] Case no. 09-11145, P-193.

[4] *Id.* at p. 25.  Smith disputes that Thundervision owns the trademark for *LH&G*, even though he signed the Amended Disclosure Statement.

[5] Case no. 09-11145, P-182.

Under Thundervision's Amended Plan of Reorganization ("Plan"), Higgins and Smith continued to manage Thundervision for the same salaries, $36,000 and $78,000 respectively.[6]

The Disclosure Statement acknowledges that prior to filing the bankruptcy petition, Smith received approximately $144,000 in excess of his salary.[7]  *In lieu* of seeking recovery from Smith, the Plan required Smith provide Thundervision office space rent free.[8]

Smith and Higgins signed the Plan as members.[9]  Confirmation was contested and tried on June 29, 2010.  Higgins testified at the confirmation hearing as to the feasibility of the Plan and attainability of the financial projections.

On June 30, 2010, the Court entered an Order confirming Thundervision's Plan.  The Plan provided that administrative claims were payable on the later of the effective date of the Plan,[10] when allowed, or due.  Priority tax claims were payable in quarterly installments.  The Plan also provided for monthly payments of $1,855 for five (5) years to Hancock Bank on its secured claim. General unsecured claims were to receive quarterly distributions over seven (7) years equal to fifty percent (50%) of net income for the first five (5) years and increasing to seventy percent (70%) of net income for the last two (2) years.

---

[6] Case no. 09-11145, Pleading 192, p. 13, and Pleading 193, p. 30.

[7] Case no. 09-11145, Pleading 193, p. 26.

[8] Smith's residence is owned by Melanie Wallace.

[9] *See* Case no. 09-11145, Pleadings 192, 226, and 230.

[10]  The Plan defines "Effective Date" as "not later than thirty (30) days after the Confirmation Order is entered, unless Hancock Bank and the Debtor agree to extend the date, but under no circumstances ... more than sixty (60) days after the Confirmation Order is entered."  No notice of effective date was filed in the case.  Under the Plan's terms, the effective date occurred on July 29, 2010.

Following confirmation, Smith began looking for a way to increase Thundervision's capital but needed to provide a return to new investors. Since the Plan required Thundervision to dedicate its revenue to repayment of administrative, priority and secured claims and to distribute half of the net profits to unsecured claimants, there were few profits to dedicate to potential investors. In November 2010, Smith, Higgins, and Thundervision's counsel, Christopher Caplinger, met with two (2) potential investors, Randy Meyer and John Wade ("Nov. 2010 Meeting"). Mr. Caplinger advised Smith and Higgins that new investment in Thundervision could obtain the future profits in only one of two ways: 1) file a motion to amend the Plan to sell Thundervision's assets paying off the Plan with the purchase price, or 2) file a motion to convert to chapter 7 and approach the chapter 7 trustee about purchasing Thundervision's assets.[11] Ultimately, Mr. Meyer and Mr. Wade did not invest in Thundervision.

From November 2010 through April 2011, the Monthly Operating Reports reflect a drop in sales.[12] In February 2011, Higgins made the decision to stop drawing a paycheck from Thundervision. His last paycheck was dated February 15, 2011. Even though he was not being compensated, Higgins continued to prepare the Monthly Operating Reports.

---

[11] The Court found Mr. Caplinger to be a credible witness. His testimony is also corroborated by the "Uncontested Material Facts" in the Joint Pre-Trial Order, which provide:

> Mr. Caplinger advised Defendants, Dale Higgins and Roger Smith, against any course of business involving transferring the assets of Thundervision to a new entity without Court involvement.

Pleading 53, p. 5.

Smith testified that Mr. Caplinger advised him he could open a new magazine with the name *LH&G*. The Court does not find his testimony credible.

[12] Adler, Exh. 15, 16, 17.

Post-confirmation Wallace was employed by *LH&G*.  In March 2011, Wallace used her *LH&G* email to send two (2) proposed magazine covers with the titles, *Louisiana* and *Our Louisiana*, to W. David Kiesel, an attorney.[13]  She sent them again by email on March 30, 2011, asking him to verify if RW Smith Publishing, L.L.C., Louisiana, and Our Louisiana were available with the Secretary of State.   The email to Mr. Kiesel contained the *LH&G* logo, and Wallace's signature block:

> Assistant to Roger Smith
> Office Manager
> Louisiana Homes & Gardens
> 225.622.1780 Office
> 225.622.4379 Fax
> 225.223.4010 Call
> P.O. Box 489
> St. Amant, LA 70774
> www.ourhouse.biz[14]

On April 1, 2011, Smith registered R W Smith Publishing, L.L.C. ("RW Smith") with the Louisiana Secretary of State. He is the sole member and manager of RW Smith.  Higgins has never had any interest in RW Smith.

The last issue of *LH&G* was published by Thundervision on May 1, 2011, and then Thundervision ceased operations.  Smith made the decision unilaterally.[15]   Smith's last paycheck from Thundervision was dated May 1, 2011, and was earned in April 2011.[16]

---

[13] Adler, Exh. 67.

[14] *Id.*

[15] Trial testimony of Smith.

[16] Higgins, Exh. 9.   Smith was paid $2,472.03 by Thundervision on May 1, 2011.  Smith historically was paid the same amount on the first and fifteenth of each month.

After *LH&G*'s last issue, RW Smith began publishing the magazine *Our Louisiana*.  RW Smith operated out of the same office as Thundervision, Smith's residence, and used the same phone and facsimile numbers, office equipment and computers owned by *LH&G*.[17]  RW Smith used Thundervision's subscription list and began sending *Our Louisiana*, rather than *LH&G*, to *LH&G* subscribers.[18]  It used *LH&G*'s advertiser list and had access to ads used previously in *LH&G* if advertisers re-ran a previous ad.[19]  Although RW Smith utilized Thundervison's assets, it did not compensate Thundervision.

RW Smith also noted on the *LH&G* Facebook page, "Remember we moved to www.facebook.com/OurLouisianaMagazine," encouraging the 1,533 people who "liked" the *LH&G* Facebook page to instead follow the *Our Louisiana*'s page.  Smith also encouraged  entry into a contest for liking the new page.[20]  RW Smith also continued the "Sonata Awards," an advertising contest held each previous year by Thundervision which culminated in a party for advertisers.[21]

Smith began receiving a salary from RW Smith in May 2011.[22]  RW Smith employed Wallace as well as several other former Thundervision employees.  RW Smith also employed Smith's son.[23]

---

[17] Trial testimony of Smith.

[18]  Trial testimony of Smith.

[19] Adler, Exh. 72.

[20] Adler, Exh. 46.

[21] Adler, Exh. 77.

[22] Adler, Exh. 43.   Smith received a total of $10,250 from RW Smith in 2011, and $20,800 in 2012.

[23]  Trial testimony of Smith.

RW Smith began using the website ourhouse.biz to solicit subscriptions to *Our Louisiana*, rather than *LH&G*.  The banner on the website was changed from *LH&G* to *Our Louisiana*.  However, the content on the website was still from *LH&G*.

Sometime after May 15, 2011, Higgins became aware that Smith had ceased publishing *LH&G*.  Higgins notified Thundervision's counsel, Stewart Peck, that Thundervision had ceased operations and that Smith was going to start a new business.[24]   On June 15, 2011, Higgins noted in the May 2011 Monthly Operating Report:

> Despite dropping cost of sales and operating costs an average 15.98% during the five months ended April 2011 compared to the previous five months, the company's corresponding drop in revenue of 16.02%, along with a negative outlook for increasing revenue caused the company to cease publication.

> Bills attributed to April, including payroll on due May 1 were paid.  The company is in [the] course of collecting receivables.  Roger Smith and Dale Higgins are not drawing and salary nor is Melanie Wallace who is handling accounts receivables collections and necessary administrative functions.[25]

On August 29, 2011, Lugenbuhl filed a Motion to Convert to Chapter 7 for default under the Plan, which was granted by the Court on September 29, 2011.   David Adler was appointed chapter 7 trustee ("Trustee").  Stewart Peck, Christopher Caplinger, and the firm of Lugenbuhl, Wheaton, Peck, Rankin & Hubbard, Thundervision's counsel, were employed by Trustee as special counsel.[26]

Higgins continued to collect the receivables of Thundervision after operations ceased  and provided Trustee approximately $60,000 in collections.[27]

---

[24]  Trial testimony of Higgins.

[25]  Higgins, Exh. 9.

[26]  Case 09-11145, P-271.

[27]  Trial testimony of Higgins.

Higgins sent Mr. Caplinger an email on January 17, 2012, informing him that Smith had started a new magazine and that Higgins had "no ownership nor input." [28]   When Higgins discovered that Smith was publishing a new magazine, he warned him not to use any assets of Thundervision, and Smith represented to Higgins that he was not.  Higgins was not aware that Smith was using Thundervision's assets or ourhouse.biz.[29]

In March 2012, Higgins, Smith, and Trustee had a meeting at which Higgins gave Trustee a British Petroleum class action claim he had prepared for Thundervision, and Higgins offered to turn over any assets of Thundervision Trustee wanted.  Trustee did not request turnover of any assets at that meeting nor at any time during the case.[30]

On September 27, 2012, Trustee filed this adversary proceeding against Smith and Higgins, on Thundervision's behalf, alleging breach of fiduciary duty, unfair trade practices, copyright infringement, and conversion.[31]

In 2012, RW Smith's gross receipts were $445,676.[32]  Its costs of goods sold was $240,354, and its other expenses were $191,484.  On his 2012 tax return, Smith claimed that RW Smith earned a net profit of $13,838.[33]  RW Smith ceased operations in January 2013.  The total compensation

---

[28] Adler, Exh. 71.

[29] Trial testimony of Higgins.

[30] Trial testimony of Higgins.

[31] P-1.

[32] Adler, Exh. 101.

[33] *Id.*

8

received by Smith from RW Smith was $27,800.[34]

## II.  Law and Analysis

Trustee filed this adversary proceeding against Smith, RW Smith, and Higgins alleging breach of fiduciary duty, unfair trade practices, copyright infringement, and conversion.

### A.  Breach of Fiduciary Duty

#### 1.  Breach by Smith

As members and managers of Thundervision, Smith and Higgins have a "fiduciary relationship" to Thundervision and must "discharge [their] duties in good faith, with the diligence, care, judgment, and skill which an ordinary prudent person in a like position would exercise under similar circumstances."[35]   The burden of proving breach of duty is on Trustee as is the burden of proving the breach was the "legal cause of damage suffered" by Thundervision.[36]

> [A] fiduciary may not take even the slightest advantage, but must zealously, diligently, and honestly guard and champion the rights of his principal against all other persons and is bound not to act in antagonism, opposition, or conflict with the interest of the principal to even the slightest extent.[37]

"In determining whether a member of an LLC had breached a fiduciary duty to the LLC and its members, at minimum, a gross negligence standard and the business judgment rule is employed."[38]

---

[34] Trial testimony of Smith.

[35] LA R.S. 12:1314(A)(1).

[36] LA R.S. 12:1314(E).

[37] *Bryan D. Scofield, Inc. v. Susan A. Daigle, Ltd.*, 999 So.2d 311, 316 2008-798 (La.App. 3 Cir. 12/10/08).

[38] *Risk Management Services, L.L.C. v. Moss*, 40 So.3d 176, 182, 09-632 (La.App. 5 Cir. 4/13/10).  *See also* LA R.S. 12:1314(B) ("[A] member or manager shall not be personally liable to the limited liability company or the members thereof for monetary damages unless the member or manager acted in a grossly negligent manner ...")

"Gross negligence" is "a reckless disregard of or a carelessness amounting to indifference to the best interests of the limited liability company or the members thereof."[39]

Smith testified when asked why he formed a new entity, "I thought it was the right thing to do." When Trustee's counsel asked, "The right thing for whom?," he replied, "For myself." Smith acknowledged that under the Plan he could not receive membership distributions until Thundervision's creditors were paid, but those restrictions did not apply to his new entity, RW Smith. He also acknowledged that he had an obligation to pay creditors under Thundervision's Plan, and that RW Smith was not burdened with those obligations. Smith's actions were self-serving, intentional, and in breach of his fiduciary duty.

After Thundervision's Plan was confirmed in late June 2010, it managed to make the quarterly payment to creditors on September 30, 2010. In November 2010, Smith was actively looking for additional investment in *LH&G* as evidenced by his meeting with Meyer and Wade. During this process, Smith clearly understood that Thundervision could not be released from its Plan obligations without a lump sum purchase of assets and court approved modification of its Plan

Coincidently, Thundervision began experiencing a drop in revenue beginning in November 2010 and continuing until Smith was able to open RW Smith in May 2011. The Court finds that Smith diverted his attention from building Thundervision's business in order to convert its opportunities to his new enterprise.

Smith breached his duty to Thundervision by stopping publication of *LH&G* and immediately opening a new publication through RW Smith utilizing Thundervision's assets, employees, office, web presence, and contacts while he was a member and manager of *LH&G*. The

---

[39] LA R.S. 12:1314(C).

10

new publication was in direct competition with Thundervision, also a conflict of interest. His actions rose above gross negligence as he knowingly and intentionally sought to further his own interests rather than Thundervision's.

While it is not a breach of fiduciary duty for a former employee "to solicit the clients of their former employers as long as they do so based on their memory, experience, or personal contacts," it is a breach of fiduciary duty to use the confidential information of the employer.[40] Smith used the advertiser and subscription lists of *LH&G* to secure advertisers and subscribers for his new magazine. In fact, he supplied his new publication to *LH&G* subscribers *in lieu* of *LH&G*. He "reminded" *LH&G* followers that *LH&G*'s Facebook page had "moved" to his new publication. He also used *LH&G*'s content on the website ourhouse.biz after changing the website's banner to *Our Louisiana*. *LH&G* was not compensated for use of any of its assets.

Smith also used *LH&G*'s advertising contest, the Sonata Awards, to benefit *Our Louisiana* and RW Smith.

Under Louisiana law, Smith must account to Thundervision for:

> [A]ny profit or benefit derived by him, without the informed consent of a majority of the members in accordance with R.S. 12:1318(C), ... from any personal use by him of its property unless he proves under strict judicial scrutiny the fairness of the transaction to [Thundervision].[41]

In a similar case, *Risk Management Services, L.L.C. v. Moss*,[42] a member of a limited liability company ("L.L.C.") began a competing company and attempted to take clients from the L.L.C. Due

---

[40] *CheckPoint Fluidic Systems Intern., Ltd. v. Guccione*, 888 F.Supp.2d 780, 796 (E.D.La. 2012) (citations omitted).

[41] LA R.S. 12:1314(A)(5).

[42] *Risk Management Services, L.L.C. v. Moss*, 40 So.3d 176, 09-632 (La.App. 5 Cir. 4/13/10).

to his behavior, including lack of attention to his duties at the L.L.C., a contract was not renewed.
The Court found that the member breached his duties to the L.L.C.  The Court awarded the L.L.C.
damages for loss of revenues that were expected to be generated from the contract.

In *Donaldson v. Bernstein*, the principals of the debtor were held to have breached their
fiduciary duty under the Plan by "diverting business opportunities ... to another company they
owned, for their personal benefit."[43]  The Court awarded the trustee the compensatory damages in
the amount of profits earned by the other company on the diverted contracts.[44]

Smith used the assets of Thundervision, without the consent of Higgins,[45] for his own profit.
He received $27,800 in total salary from RW Smith.   In 2012, RW Smith made a profit of $13,838.
Assuming that RW Smith's 2011 profit was the same, RW Smith's profit in 2011 would have been
$9,225, since RW Smith only operated for eight (8) months in 2011.  The Court finds that Smith is
liable to Thundervision in the total amount of $50,863 for breach of fiduciary duty.

Trustee also contends that Smith should disgorge all compensation including that received
during the administration of Thundervision's chapter 11 case.  Smith received salary by informed
consent of the members of the Thundervision, and  the Plan provided for his salary.  Trustee has not
offered any evidence of fraud, defalcation, mismanagement or breach of duty during the chapter 11
case.  Post-confirmation, Trustee has established that in March and April 2011, Smith was actively
planning his new start up.  As a result, the Court will order disgorgement of his compensation for

---

[43] *Donaldson v. Bernstein*, 104 F.3d 547, 551 (3rd Cir. 1997).

[44]  The Court also awarded punitive damages under Pennsylvania law.  Louisiana law
does not provide for punitive damages for breach of fiduciary duty.

[45] Because Higgins and Smith each have a 50% membership interest, consent of both is
needed for a majority.  *See* LA R.S. 12:1314(A)(5).

the period of time during which Smith actively engaged in planning his new venture, RW Smith

(March and April 2011).  This amounts to $13,000 in gross wages.  Therefore, the total amount

owed by Smith for breach of fiduciary duty is $63,863.

Trustee contends that Smith benefitted from the salaries of his son and Wallace, so these

should also be part of his damages.   Trustee has not met his burden of proving how much of these

salaries, if any, benefitted Smith.

### 2.  Breach of Fiduciary Duty by Higgins

Trustee alleges that Higgins breached his fiduciary duty to Thundervision by failing to

monitor Smith's activities.[46]   Higgins was the Chief Financial Officer of Thundervision and was

responsible for preparing the Monthly Operating Reports.  He was not involved in the daily

operation of *LH&G*.  Higgins was paid  $36,000 per year by Thundervision.  When Thundervision

began having financial difficulty in February 2011, Higgins voluntarily stopped taking compensation

in order to help Thundervision.  His last paycheck was dated February 15, 2011.  Even though he

was not being compensated, he continued to prepare the Monthly Operating Reports.

Sometime after May 15, 2011, Higgins became aware that Smith had ceased publishing

*LH&G*.  Higgins dutifully notified Thundervision's counsel, Stewart Peck, that Thundervision had

ceased operations and that he thought Smith was going to start a new business.  Higgins testified that

he believed Smith ceased operations because Thundervision was not profitable.

---

[46]  Alleged pre-confirmation conduct by Higgins, such as negligence regarding draws by
Smith and oversight of Wallace, have not been proven.  The record does not support the
allegation that Smith received or diverted any income during the administration of the case not
authorized by the Court.  Similarly, the evidence entered at trial did not reflect any negligence or
impropriety in the accounting of Thundervision during the administration of the bankruptcy case.

Higgins was not involved in either RW Smith or *Our Louisiana* in any way.   Until January

2012, he was unaware of Smith's alternative operations.  When Higgins discovered Smith's actions,

he informed Thundervision's former counsel, Mr. Caplinger.[47]  He also warned Smith not to use any

of Thundervision's assets, and Smith represented to Higgins that he was not.

"In determining whether a member of an LLC had breached a fiduciary duty to the LLC and

its members, at minimum, a gross negligence standard and the business judgment rule is

employed."[48]   "Gross negligence" is "a reckless disregard of or a carelessness amounting to

indifference to the best interests of the limited liability company or the members thereof."[49]

As Chief Financial Officer of Thundervision, Higgins knew that the company was not

meeting its financial projections and was unable to make all of its Plan payments.     It was

reasonable for him to believe Smith's assertion that he ceased operations for that reason.   Higgins

had no knowledge of or interest in RW Smith.  When he learned that Smith had ceased operations,

and then again when he learned that Smith had started a new magazine, Higgins contacted

Thundervision's counsel.  Higgins was not involved in Smith's actions and did not stand to profit

or benefit from Smith's ventures.   The Court finds that Higgins was not grossly negligent in

exercising his duties to Thundervision  and instead informed Thundervision's counsel when

problems arose.  Higgins did not breach his fiduciary duty to Thundervision.

---

[47] Adler, Exh. 71.

[48] *Risk Management Services, L.L.C. v. Moss*, 40 So.3d 176, 182, 09-632 (La.App. 5 Cir. 4/13/10).  *See also* LA R.S. 12:1314(B) ("[A] member or manager shall not be personally liable to the limited liability company or the members thereof for monetary damages unless the member or manager acted in a grossly negligent manner ...")

[49] LA R.S. 12:1314(C).

### B. Unfair Trade Practices

The Louisiana Unfair Trade Practices and Consumer Protection Law ("LUTPA") declares unlawful "[u]nfair methods of competition and unfair or deceptive acts or practices in the conduct of any trade or commerce."[50]  Unfair practices "offend established public policy" and are "unethical, oppressive, unscrupulous, or substantially injurious."[51]  Deceptive practices amount to "fraud, deceit, or misrepresentation."[52]

"LUTPA recognizes a claim for breach of fiduciary duty that rests on the misappropriation of information that is confidential but not a trade secret."[53]  Taking the customers and employees of the L.L.C. of which you are a member amounts to prohibited unfair trade practices.[54]  Smith violated LUTPA by using the advertiser list of *LH&G* for *Our Louisiana*.   Smith alleges that use of *LH&G*'s advertiser list is not a violation because the advertisers may be discovered by looking at an issue of *LH&G*.  However, the advertiser information used by Smith contained more than just the advertiser's names.  It also contained their contact information, contract terms, and the copy of specific ads run in *LH&G*.[55]

---

[50] LA R.S. 51:1405(A).

[51] *Risk Management Services, L.L.C.*, 40 So.3d at 184.

[52] *Id.*

[53] *CheckPoint Fluidic Systems Intern., Ltd.*, 888 F.Supp.2d at 795.

[54] *Id.* at 185.

[55] For example, in a May 23, 2011, email thread between Wallace and Mark Owen Pritchard, Mr. Pritchard asked whether his ad that ran in the summer of 2010 could be re-used for the July 2011 issue.  This shows that *Our Louisiana* had access to ads run in *LH&G*.  Adler, Exhibit 74.

Smith and RW Smith violated LUTPA by using the same contact information (mailing address, phone number, and fax number) as *LH&G*.  By changing only the name of the magazine, when advertisers or subscribers called, Smith seamlessly captured their business for the new magazine.  Similarly, Smith fulfilled existing subscriptions to *LH&G* with his new magazine and solicited new or renewal subscriptions for *Our Louisiana.*

Social media is also an important marketing tool.  RW Smith used the Facebook page established by Thundervision for *LH&G* to divert followers to *Our Louisiana's* Facebook page. Posts to *LH&G*'s Facebook page dated May 18, 2011; July 13, 2011; and August 2, 2011 remind followers of *LH&G* that the page has "moved" to *Our Louisiana's* Facebook page and offer entry into a contest for "liking" *Our Louisiana*.[56]  Taking away followers of *LH&G* and diverting them to *Our Louisiana* violated LUTPA.

Higgins had no part in Smith's or RW Smith's deceptive and unfair trade practices and did not violate LUTPA.

Under LUTPA, damages are recoverable when "the plaintiff proves some element of fraud, misrepresentation, deception, or other unethical conduct."[57]

> Any person who suffers any ascertainable loss of money or movable property, corporeal or incorporeal, as a result of the use or employment by another person of an unfair or deceptive method, act, or practice declared unlawful by [LUPTA], may bring an action individually but not in a representative capacity to recover actual damages. ... In the event damages are awarded under this Section, the court shall award to the person bringing such action reasonable attorney fees and costs.[58]

---

[56] Adler, Exh. 46.

[57] *Risk Management Services, L.L.C.*, 40 So.3d at 184.

[58] LA R.S. 51:1409(A).  Under LUPTA, a "person" includes a legal entity.  LA R.S. 51:1402(8).  There is no allegation that Smith or Higgins were put on notice of possible unfair trade practices by the attorney general, so treble damages are not recoverable.

Smith shut down Thundervision and took its clients and employees for his own business.  The Court finds that Smith's solicitation of outside investment and meetings with counsel establish that as early as November 2010 Smith was exploring the possibility of freeing himself from the constraints of the Plan.  As a result, the decline in revenues of Thundervision from November 2010 through May 2011 can be explained by Smith's loss of interest in Thundervision coupled with his desire to operate without the burden of Thundervision's reorganized debt load.  Jurisprudence establishes that loss of profits is an appropriate measure of damages under LUTPA.[59]  Smith used the assets of Thundervision, without the consent of Higgins, for his own profit.

The Court finds that Smith and RW Smith are liable to Thundervision in the total amount of $63,863 for violation of LUTPA.  However, because the Court has already awarded $63,863 in damages against Smith for breach of fiduciary duty, it may not impose the recovery twice.  Thus, under either a breach of fiduciary duty or LUTPA theory of recovery, Smith and RW Smith are liable to Thundervision for $63,863.

Under LUTPA, Thundervision is entitled to reasonable attorney's fees and costs.  This Court approved Trustee's special counsel in this matter at a contingency fee of 40% of any recovery, plus out-of-pocket expenses.[60]  Therefore, Thundervision is entitled to attorney's fees in the amount of $25,545.20.  Thundervision is also entitled to reasonable costs.  The Court will set a deadline for Trustee to submit an itemized list of costs.

---

[59] *See Roustabouts, Inc. v. Hamer*, 447 So.2d 543, 550 (La.App. 1 Cir. 1984) (Stockholders and employees of original business began a competing business that took clients from original business while using its equipment and personnel.  The court compared the tax returns and sales the original business before and after the competing business was started in order to determine damages.)

[60] Case 09-11145, Pleadings 280 and 281.

### C. Conversion

Trustee alleges that Smith is liable for conversion of Thundervision's assets because he used the assets for RW Smith.   Conversion is a delictual action "in derogation of the plaintiff's possessory rights or any wrongful exercise or assumption of authority over another's goods, depriving him of permanent or indefinite possession."[61]

> In order to prevail on a claim of conversion under Louisiana law, the plaintiff must prove that (1) he owned or had the right to possess; (2) the defendant's use was inconsistent with the plaintiff's right of ownership; and (3) the defendant's use constituted a wrongful taking.[62]

Smith converted Thundervision's assets for his own use.   The measure of damages for conversion is the value of the property plus interest.[63]   The party alleging conversion bears the burden of proof.[64]   Trustee introduced no evidence of value of Thundervision's assets.   Therefore, no damages are awarded for conversion.

### D.  Plan Failure

In his Post-Trial Memorandum, Trustee contends that Thundervision is entitled to damages because Smith and Higgins chose to file Thundervision's bankruptcy case under chapter 11 of the Bankruptcy Code rather than chapter 7.

---

[61] *Bernofsky v. Tulane University Medical School*, 962 F.Supp. 895, 906 (E.D.La. 1997).

[62] *Id.*

[63] *Iturralde v. Shaw Group, Inc.*, 2012 WL 1565356, *6 (M.D.La. 2012).

[64] *Crawford v Reagan*, 779 So.2d 1116, 1119, 34,417 (La.App. 2 Cir. 2/28/01).

18

Cases analogize this allegation to a breach of the duty of care.[65]   In Louisiana, a member or manager of an L.L.C. is not personally liable to the L.L.C. or its members:

> [U]nless the member or manager acted in a grossly negligent manner as defined in Subsection C of this Section, or engaged in conduct which demonstrates a greater disregard of the duty of care than gross negligence, including but not limited to intentional tortious conduct or intentional breach of his duty of loyalty.[66]

"Gross negligence" is defined as " a reckless disregard of or a carelessness amounting to indifference to the best interests of the [L.L.C.] or the members thereof."[67]   The burden of proving a breach of duty of care is on the person alleging the breach, in this case Trustee.

Smith and Higgins consulted counsel prior to filing bankruptcy.   Once in bankruptcy, Thundervision filed a feasible Plan which was confirmed on June 30, 2010.   Confirmation of the Plan is evidence that reorganization was likely and feasible.   Trustee has not shown gross negligence in choosing to file a bankruptcy petition under chapter 11.   Therefore, Trustee has not met his burden of proving breach of duty of care or fraud.

Trustee also contends that Smith and Higgins should be equitably estopped from now maintaining that the Plan was unfeasible, since they previously represented to the Court prior to confirmation that the Plan was feasible.   In confirming the Plan, this Court found that the Plan was feasible based on the projections presented at the confirmation hearing.   However, feasibility rulings do not amount to a guarantee.   Every plan of reorganization has risks associated with meeting the plan's projections.   In this case, Thundervision did not meet its revenue projections post-

---

[65] *In re Lear Corp. Shareholder Litigation*, 967 A.2d 640 (Del.Ch. 2008); *In re Soporex, Inc.*, 463 B.R. 344 (Bankr.N.D.Tex. 2011).

[66] LA R.S. 12:1314(B).

[67] LA R.S. 12:1314(C).

19

confirmation, and Trustee presented no evidence that the projections were fraudulently presented. The Plan was confirmed on June 30, 2010, and Thundervision continued publishing *LH&G* through April 2011. The Plan ultimately failed  because Smith diverted assets to his personal use and captured the business opportunities of Thundervision in an effort to start a competing business. Each of these actions amounts to breach of fiduciary duty and a violation of LUTPA as discussed *supra*.

### E.  Copyright Infringement

In Count III of the Complaint, Trustee alleges that RW Smith and Smith "willfully and intentionally infringed Plaintiff's copyright interests" by continuing to use *LH&G*'s photographs and articles on ourhouse.biz once it was taken over by *Our Louisiana*.  Under the Copyright Act,[68] copyright ownership automatically vests in the author or authors of an original work.[69]  The author has the exclusive right to reproduce, distribute, or display the work.[70]  However, in the case of a "work made for hire," which includes "a work prepared by an employee within the scope of his or her employment," the employer is considered the author of the work and owner of the copyright.[71] Thus, Thundervision holds the copyright of the photographs and articles from *LH&G* used on the ourhouse.biz website.

---

[68] 17 U.S.C. § 101 *et seq.*

[69] 17 U.S.C. § 201(a).

[70] 17 U.S.C. § 106.

[71] 17 U.S.C. §§ 101, 201.

Smith personally owns the domain name ourhouse.biz. Smith admitted at trial that *LH&G*'s articles and photographs were used on the ourhouse.biz website after *LH&G* ceased operations and after Smith and RW Smith changed the banner on the website from *LH&G* to *Our Louisiana*. Smith also admitted at trial that no compensation was given to Thundervision for use of its property. Smith made no allegation that Thundervision consented to use of its photographs or articles or transferred ownership of this property. Therefore, Smith and RW Smith violated the Copyright Act.

Generally, a person who violates the Copyright Act is liable for either:

(1) the copyright owner's actual damages and any additional profits of the infringer,...; or

(2) statutory damages....[72]

Trustee produced no evidence of actual damages or additional profits attributable to use of the articles and photographs. Statutory damages are calculated per work used. However, Trustee did not prove which articles and photographs were used or even the number of articles or photographs used in violation of the Copyright Act, making calculation of damages impossible.

### F. Contempt of Court

In his Post-Trial Memorandum, Trustee contends that Smith should be held in contempt of court and sanctioned for violating the Confirmation Order. Trustee did not ask for such sanctions in the Complaint. Issuing sanctions without notice and hearing would violate due process.

In his Post-Trial Memorandum, Trustee further contends that *nunc pro tunc* substantive consolidation of Smith and Thundervision's assets is appropriate because Smith commingled Thundervision's assets with his own and "failed to maintain any corporate distinction." Trustee

---

[72] 17 U.S.C. § 504(a).

introduced no evidence at trial to prove commingling of assets or failure to maintain corporate distinction.[73]

## III. Conclusion

RW Smith and Smith are liable severally and *in solido* to Thundervision in the amount of $63,863, plus federal judicial interest from the date of demand, for breach of fiduciary duty and LUTPA.    Smith and RW Smith are also liable severally and *in solido* for attorneys' fees in the amount of $25,545.20.  They are also liable for reasonable costs.  The Court will set a deadline for Trustee to file an itemized list of costs as well as a deadline for Smith and RW Smith to file any objections.

The Court finds in favor of Dale C. Higgins and against David V. Adler, Trustee, on all counts.

New Orleans, Louisiana, February 5, 2014.

Hon. Elizabeth W. Magner
U.S. Bankruptcy Judge

---

[73] La. C.C. art. 1786, 1787, and 1790.